## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MILITARY ORDER OF THE PURPLE HEART<br>　　　SERVICE FOUNDATION, INC.,<br>　　a Florida corporation,<br>　　7008 Little River Turnpike, Suite D<br>　　Annandale, VA 22003, and<br><br>MOPHSF HOLDINGS, LLC,<br>　　　a Florida limited liability company,<br>　　　7008 Little River Turnpike, Suite D<br>　　　Annandale, VA 22003<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>MILITARY ORDER OF THE PURPLE HEART<br>　　　OF THE UNITED STATES OF AMERICA,<br>　　　INC.,<br>　　a District of Columbia corporation,<br>　　5413-B Backlick Road<br>　　Springfield, VA 22151<br><br>　　　　Defendant. | Civil Action No. _____ |

## COMPLAINT

Plaintiff The Military Order of the Purple Heart Service Foundation, Inc. (the "Foundation") has a sixty-year record of charitable fundraising and other activities to provide support to veterans of the United States military and their families. Defendant The Military Order of the Purple Heart of the United States of America, Inc. (the "Order") has been a significant beneficiary of the Foundation's fundraising efforts over the course of the Foundation's existence.

In recent years, however, the Order has engaged in a protracted attempt to disrupt the activities of and ultimately arrogate to itself the valuable assets and goodwill of the Foundation. In 2009, after prior disputes, the parties signed a Memorandum of Understanding ("MOU") to coordinate their activities to better serve their common mission of assisting veterans. The MOU

recognized that the Foundation and Order were "separate and distinct" entities and that the Order would not undertake activities that would "conflict with or interfere with" the Foundation's fundraising. In 2016, following additional disputes, the parties entered into a Settlement Agreement that, among other things, prohibited the Order from seeking to disfranchise or otherwise taking adverse action against the Foundation. In contravention of the 2009 and 2016 Agreements, however, the Order has interfered with the Foundation's fundraising efforts and has taken actions in an attempt to harm the Foundation. The Order's goal in these actions is to lay claim to the Foundation's funds and the service marks related to the Foundation held by Plaintiff MOPHSF Holdings, LLC ("MOPHSF Holdings"), an entity wholly owned by the Foundation.

The Order has not been able to seize control of the Foundation, but its efforts have caused considerable disruption to the Foundation's fundraising activities and confusion among prospective Foundation donors. The Foundation and MOPHSF Holdings bring this action seeking: 1) declaratory relief establishing that the Order's contractual breaches relieve the Foundation of further obligations under the contracts between the parties; and 2) injunctive relief to prevent the Order's unauthorized use of the intellectual property held by MOPHSF Holdings and interference with the Foundation's activities.

## **PARTIES**

1.      Plaintiff The Military Order of the Purple Heart Service Foundation, Inc. (the "Foundation") is a Florida not-for-profit corporation organized under section 501(c)(3) of the Internal Revenue Code. At all relevant times, the principal place of business of the Foundation has been in Annandale, Virginia.

2.      Plaintiff MOPHSF Holdings, LLC is a Florida limited liability company. Its sole member is the Foundation. MOPHSF Holdings was created by the Foundation to be the holder of

the Foundation's trademarks, trade names, trade dress, and other intellectual property, and it continues to perform this function to the present. At all relevant times, the principal place of business of MOPHSF Holdings has been in Annandale, Virginia.

3.     Defendant The Military Order of the Purple Heart of the United States of America, Inc. (the "Order") is a District of Columbia not-for-profit corporation organized under section 501(c)(19) of the Internal Revenue Code. At all relevant times, the principal place of business of the Order has been in Springfield, Virginia.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 1367.

5.     This Court has *in personam* jurisdiction over the Order because the Order is incorporated in this district and conducts business in this district.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Order is a resident of this district.

## BACKGROUND FACTS

### The Formation of the Order and the Foundation

7.     The Order is a Congressionally chartered membership organization comprised of Purple Heart medal recipients. It was formed in 1932 to protect and serve the interests of Purple Heart recipients and their families. It received its Congressional charter in 1958.

8.     In the early 1950s, the Order recognized the benefit of a service foundation or fund separate from and independent of the Order. At its 1951 national convention, the Order resolved to begin the process of forming such an entity. The Order believed that the creation of a separate service foundation and fund would add to the prestige and reputation of the

organization, and would permit a greater amount of service work and aid for veterans. The separation of entities was also intended to ensure that each entity would be able to maintain its separate not-for-profit tax status. Accordingly, in 1957, the Order passed a resolution to create a service foundation. At the same time, it promulgated the Foundation's initial articles of incorporation, forming it as a Wisconsin not-for-profit corporation.

9.     The Foundation amended and restated its articles of incorporation in 1999 and again in 2015. In 2015, the Foundation became a Florida entity and adopted new articles of incorporation and bylaws.

10.     Over the years, the Foundation's purpose and objectives have included raising funds for service, welfare, and rehabilitation work in connection with the members of the Order and all veterans and their dependents, as well as maintaining and developing separate and independent programs for the benefit of veterans and their dependents. Because the Foundation is not a membership organization, it has often relied on the Order's membership roster in connection with its fundraising appeals.

11.     Throughout its existence, the Foundation has raised and contributed funds to numerous veteran-related organizations and programs. The Order has been the primary recipient of such efforts, and the Foundation has granted the Order more than $180 million in total over the past thirty years. The Foundation has also long provided additional funds to other organizations that support veterans, and has independently given assistance to veterans directly.

12.     The Foundation raises funds through a variety of means. It participates in vehicle and thrift donation programs pursuant to which it collects monies in connection with the sale of automobiles and donated clothing and other materials it provides to thrift shops. It also solicits funds directly from the public and the Order's membership, via social media and other internet

campaigns, direct mailings, and call centers. The Foundation has further forged a number of corporate partnerships where proceeds from the sale of jewelry, clothing, wine, or other consumer goods are donated to the Foundation. To support these efforts, the Foundation also regularly engages in broad publicity efforts to build and maintain its brand awareness among the Order's membership and the broader donating public. The Foundation has developed deep expertise in the area of charitable fundraising on behalf of veterans and their families.

13.     To assist its fundraising efforts, the Foundation has also developed and used two federally registered service marks. One of these, the service mark MILITARY ORDER OF THE PURPLE HEART SERVICE FOUNDATION, Registration No. 2,208,425, is registered for "providing scholarships, tuition assistance and financial aid to combat-wounded veterans, their dependents and survivors" and "association services, namely, promoting the interests of combat-wounded veterans, their dependents and survivors." The Foundation has used this mark in commerce since at least 1957.

14.     The Foundation's other federally registered service mark, PURPLE HEART, Registration No. 4,015,788, is registered for "charitable fundraising." The Foundation has used this mark in commerce since at least 1991 and, as part of the service mark MILITARY ORDER OF THE PURPLE HEART SERVICE FOUNDATION, since at least 1957.

15.     The registration for each mark is valid and in full force and effect, and is incontestable.

16.     The PURPLE HEART and the MILITARY ORDER OF THE PURPLE HEART SERVICE FOUNDATION marks represent and symbolize the reputation and valuable goodwill of the Foundation and are recognized by consumers throughout the United States in connection with the Foundation's fundraising activities.

17.     The service marks described in paragraphs 13 through 16 above are referred to in this Complaint as "the Foundation Marks" or "Marks."

### 2009 Memorandum of Understanding

18.     In spite of the ongoing relationship between the Foundation and the Order, the Foundation has always been a separate entity from the Order in legal and practical terms. This separation is evidenced by a number of indicia: the entities are separately incorporated and have separate bylaws; they maintain separate finances; and they operate autonomously. The Foundation's 1957 articles of incorporation do not mention the Order. Neither the Foundation's 1999 articles of incorporation nor the 2015 revision to those articles give the Order any power to control the Foundation. In addition, for many years, the key PURPLE HEART service mark for fundraising purposes has been owned by the Foundation or an entity controlled by the Foundation, with the use of the service mark for fundraising purposes by the Order allowed today only with the Foundation-controlled entity's permission.

19.     The independence of the Foundation was reaffirmed in a 2009 Memorandum of Understanding ("MOU") between the parties. A true copy of the 2009 MOU is attached hereto as Exhibit A. The MOU confirmed that the parties "desire[d] to maintain their independence and separate corporate structure." However, they believed that it was "in their respective best interests to formalize, where practicable[,] and memorialize herein, a working policy that they can adhere to that will maintain their independence yet facilitate the daily operations of both entities so that their respective goals and missions can be realized."

20.     The Order agreed in the 2009 MOU to provide monthly financial statements to the Foundation. *Id.* § 3. It further agreed to "advise the Foundation of all fundraising efforts being undertaken by its Departments, Chapters and Affiliates so that any local fundraising effort

does not conflict with or interfere with the Foundation's fundraising activities or those of its fundraisers." *Id.* § 5. The Order's commitment not to undertake competing fundraising activities or interfere with the Foundation's activities was important because, for its part, the Foundation agreed to, "[b]ased on its financial ability as determined by the Foundation, . . . use its best efforts to tentatively agree to the Order's grant request at the Order's Finance Committee meeting in July." *Id.* § 10. The parties also agreed to coordinate "[a]ll public relation initiatives including press releases . . . to the extent possible." *Id.* § 8.

21.     Since the execution of the 2009 MOU, all grants issued by the Foundation to the Order have been made on the condition that the Foundation "reserves the right to not fund this Grant in whole or in part in its sole and absolute discretion." This condition has continuously been accepted by the Order as a prerequisite for its receipt of funds from the Foundation.

22.     Finally, the parties "acknowledge[d] and agree[d] that they are separate and distinct corporate entities and nothing provided for [in the 2009 MOU] shall be construed as to create any principal agent relationship, partnership or co-venture relationship." *Id.* § 11.

**The Order's 2016 Attempts to Assert Control over the Foundation**

23.     Angered by a reduction in funds provided by the Foundation, on March 2, 2016 a member of the Order purported to file a "grievance" against the Foundation pursuant to a process outlined in the Order's bylaws. Although the grievance was devoid of any factual basis and procedurally improper, because the Foundation is a separate entity not subject to the Order's internal procedures, the Foundation engaged in prolonged discussions with the Order to attempt to resolve the dispute.

24.     During the course of these discussions, a small cabal of members of the Order embarked on a campaign to try to take over the Foundation Marks and the operations, management, and funds of the Foundation. Among other things, they disparaged the Foundation

in communications to the membership of the Order and demanded the resignation of the entire Foundation board. These members of the Order eventually began to circulate and promote a resolution to "dis-franchise" the Foundation, to be introduced at the Order's August 2016 National Convention.

### 2016 Settlement Agreement

25.     Discussions regarding the Order's improper takeover attempt continued throughout the summer of 2016. In spite of the acrimonious nature of this dispute, the parties were ultimately able to resolve their disagreements and establish a *modus vivendi* memorialized in a Settlement Agreement executed September 1, 2016. A true copy of the 2016 Settlement Agreement is attached hereto as Exhibit B. As with the 2009 MOU, the 2016 Settlement Agreement did not purport to alter the legal independence of the parties.

26.     Because one of the most significant sources of disagreement between the Order and the Foundation concerned the ways in which the Foundation made its funding decisions, the Foundation agreed in the Settlement Agreement to establish a formal prioritization of "its funding each year, highest to lowest," as follows:

    a. The Foundation's "own reasonable and necessary operations . . . including public education programs"

    b. The "reasonable operations and expenses" of the new intellectual property holding entity to be created by the Foundation

    c. The "reasonable budget submitted to [the Foundation] by the Order"

    d. Building up the Foundation's financial reserves "to a minimum of . . . the two prior years of operating expenses"

    e. "[A]dditional grants to other 501(c)(3) entities"

*Id.* § 3.

27.     The Settlement Agreement superseded "any prior Agreements with respect to the specific issues set forth in this Agreement," *id.* § 9, but did not otherwise alter any preexisting

agreements between the parties. Thus, while it established a formal prioritization for the Foundation's funding decisions, it did not affect the Order's obligations from the 2009 MOU, including the obligations to not interfere with the Foundation's fundraising efforts and to coordinate its public relations initiatives with the Foundation.

28.     The parties also agreed to an arrangement for sharing their financial records with one another, permitting each "the opportunity to periodically review the financial and operational records" of the other. *Id.* § 2.

29.     Recognizing that its prior attempts to take over control of the Foundation were improper, the Order agreed that, should it "seek[] to 'disenfranchise' or take[] other adverse action against the Service Foundation during its August 2016 National Convention or thereafter . . . this entire Agreement will be considered null and void and of no further force or effect after a notice to cure as provided for in this Agreement has been served by the Service Foundation upon the Order." *Id.* § 6.1.

30.     For other material violations of the Agreement's terms, the Agreement provided that it "may be terminated by either Party with cause upon default by the other Party under any material term of this Agreement and failure to cure such default within one hundred twenty (120) days after receipt of written notice specifying the precise nature of such default." *Id.* § 7.3.

**The Creation of MOPHSF Holdings and the Licensing of the Foundation Marks**

31.     The Settlement Agreement also required the Foundation to create a new entity to hold its marks. Accordingly, in February 2017 the Foundation created MOPHSF Holdings as a nonprofit limited liability company and assigned the Foundation Marks to MOPHSF Holdings. As a result of the assignment, MOPHSF Holdings has the exclusive right to conduct and license others to conduct charitable fundraising under the PURPLE HEART and the MILITARY

ORDER OF THE PURPLE HEART SERVICE FOUNDATION marks. The Foundation was and remains the only member of MOPHSF Holdings. The Settlement Agreement also provided that if the Foundation should dissolve, go out of business, or not fund the Order, the assets and control of MOPHSF Holdings would be transferred from the Foundation to the Order. None of these three events has occurred.

32.     In 2017, at the time that it created the new entity, the Foundation also entered into an Operating Agreement with MOPHSF Holdings to govern the operations of the new entity. The Operating Agreement provided, in part, that MOPHSF Holdings "is organized and shall be operated exclusively for the benefit of, to perform the functions of, and to carry out the purposes of" the Foundation. *Id.* § 2.5.

33.     Simultaneous with the Foundation's assignment of the Foundation Marks to MOPHSF Holdings, MOPHSF Holdings executed license agreements to permit use of the Marks by the Order and the Foundation. A true copy of the Trademark and Service Mark License Agreement to Service Foundation ("Foundation License Agreement") is attached hereto as Exhibit C. A true copy of the Trademark and Service Mark License Agreement to Order ("Order License Agreement") is attached hereto as Exhibit D.

34.     The Foundation License Agreement specifies that it is unrestricted in scope. Foundation License Agreement § 1.3.

35.     In contrast, the Order License Agreement contains several restrictions. In particular, the Order agreed not to "sub-license" the Marks or "otherwise give any other party any right to use" them. Order License Agreement § 1.2; *see also* § 6.2 ("This Agreement is personal to [the Order] and may not be assigned, including to any successor entity."). The Order also agreed that its license was limited to use of the Marks "only in connection with charitable

fundraising for specific projects *that are approved by MOPHSF Holdings, LLC* and are consistent with [the Order's] mission statement." *Id.* § 1.3 (emphasis added). Further, the Order agreed that its "sales and marketing policies" would not "be inconsistent with the policies and marketing strategies" set by MOPHSF Holdings. *Id.* § 2.5.

36.     The Order further agreed to "avoid any activity detrimental to" the Marks. *Id.* § 2.1. It also agreed that MOPHSF Holdings was the owner of the Marks, that the Order's use of the Marks would inure to the sole benefit of MOPHSF Holdings, and that the Order would not do anything "that would depreciate the value or reputation" of the Marks. *Id.* Article 3. The Order also agreed not to, "during and after termination" of the Order License Agreement, "adopt or use, *without [MOPHSF Holdings's] prior consent*, any word, mark, or design which is similar to, or likely to be confused with," the Marks. *Id.* § 5.4 (emphasis added).

### The Order's Interference with the Foundation's Fundraising

37.     While the 2016 Settlement Agreement theoretically put an end to the dispute between the Foundation and the Order, the Order thereafter renewed its efforts to interfere with the Foundation's operations and fundraising efforts. The Order's goal was and remains to drive the Foundation into insolvency so as to be able to take control of the Foundation Marks. Specifically, and in contravention of the MOU, the Settlement Agreement, and the Order License Agreement, the Order has in fact undertaken fundraising efforts and other activities that conflict with and interfere with those of the Foundation; has failed to coordinate its public relations initiatives with those of the Foundation; has used the Marks for fundraising projects not approved by MOPHSF Holdings; has disparaged the Foundation to the veteran community and the public; and has taken other actions adverse to the Foundation in contravention of the

agreements between the parties. All of these actions have harmed the Foundation's efforts to raise funds for the benefit of veterans and their families.

*Corporate Partnerships*

38.     In the first half of 2016, the Foundation was engaged in discussions for a fundraising partnership with Mission BBQ, a Maryland-based restaurant chain that currently has approximately seventy-four locations in sixteen states. Mission regularly runs promotions to donate money from the purchase of commemorative beverage cups to various veterans' organizations, including Wreaths Across America and United Service Organizations. *See Wreaths Across America Partners with Mission BBQ*, WREATHS ACROSS AMERICA, https://www.wreathsacrossamerica.org/pages/14720/News/92; *Corporate Partners*, UNITED SERVICE ORGANIZATIONS, https://www.uso.org/take-action/corporate-partners. The Foundation estimated that it would have generated more than $400,000 from the promotion.

39.     Because of the publicity and controversy regarding the Order's attempts to disfranchise the Foundation at the Order's August 2016 convention, the Foundation was unable to continue its discussions with Mission BBQ. Mission BBQ ultimately conducted its promotion with United Service Organizations instead.

40.     In late 2018, the Foundation partnered with Nexen Tire for a promotion called "American Muscle for American Heroes." Under the promotion, Nexen was to give away a customized Dodge Challenger to a Purple Heart recipient. *The "American Muscle for American Heroes Dodge Challenger Giveaway" Promotion Official Rules*, NEXEN TIRE, https://www.nexentireusa.com/nexenheros-rules. Nexen and the Foundation anticipated repeating the promotion on a regular basis, three or four times annually. *See Fox and Friends – Nexen Hero*, at 2:48, YOUTUBE.COM, https://youtu.be/sW5mouL8XIM?t=162 (Oct. 24, 2018)

(stating that the late-2018 giveaway was to be "the first of many"). In October 2018, a member of the Foundation board, James Blaylock, appeared on *Fox and Friends* to publicize the promotion.

41.     By email sent on November 7, 2018, Steve Ruckman, Chief Executive Officer of the Foundation, introduced Felix Garcia, III, National Senior Vice Commander of the Order and *ex officio* member of the Foundation's Board, to Nexen personnel. Ruckman requested that Garcia create a panel of Purple Heart recipients to select one Purple Heart recipient to win the car, and coordinate that process with Nexen. By the end of November, however, when Ruckman had received no further notifications from Nexen or Garcia regarding the promotion, Ruckman contacted the Nexen public relations department. He discovered that Garcia had included in the administration of the promotion other members of the Order who were not involved with the Foundation, to the exclusion of the Foundation. Moreover, Douglas Greenlaw, National Commander of the Order and *ex officio* board member of the Foundation, had taken it upon himself (without authorization) to usurp the Foundation's television appearance for the announcement of the winner on *Fox and Friends*.

42.     Through the efforts of Garcia and Greenlaw, the Order managed to co-opt the promotion, displace the Foundation, and insert itself into publicity surrounding the promotion. Greenlaw was the only Foundation representative quoted in the Nexen press release and appeared on television to give the car away without any other representative of the Foundation present. *See Nexen Tire Announces Veteran Marine Cpl. Steven Diaz as Recipient of American Muscle for American Heroes Nexen Tire Dodge Challenger R/T*, NEXEN TIRE, https://www.nexentireusa.com/files/documents/Nexen-PH-Challenger-Winner-Announcement.pdf; *Fox and Friends – Nexen Hero Challenger Giveaway*, YOUTUBE.COM,

https://youtu.be/EigOh6mGvlo?t=159 (Dec. 19, 2018). As a result, the Foundation was unable to use the appearance as intended – to promote the Foundation's overall fundraising efforts and the need for the public to donate funds to the Foundation as a means of assisting veterans and their families.

43.     Since the execution of the 2016 Settlement Agreement, at least three more of the Foundation's corporate partnerships have suffered or failed because of the Order's refusal to provide information about these partnerships to its membership, in derogation of the Order's obligations to coordinate its public relations initiatives with those of the Foundation, not to take adverse action against the Foundation, and not to adopt sales and marketing strategies inconsistent with those of MOPHSF Holdings.

44.     BIXLER is the officially licensed jeweler of the Foundation and offers a line of PURPLE HEART jewelry. *The Purple Heart Foundation Jewelry*, BIXLER, https://www.bixlers.com/valor/purple-heart. The Foundation receives a portion of the proceeds of this jewelry line. *Id.* Accordingly, it is to the benefit of the Foundation's fundraising efforts and the mission of the Foundation and the Order to promote this jewelry line and to ensure that the Order's membership is aware of it.

45.     In spite of initial cooperation and regular requests from the Foundation that the Order continue to publicize the jewelry line to its members, the Order refused to do so, resulting in lost fundraising opportunities for the Foundation.

46.     Similarly, US Wings, a provider of aviation apparel to the United States government, offers a licensed PURPLE HEART line of jackets, patches, hats, and other items. *Purple Heart Archives*, US WINGS, https://www.uswings.com/product-

category/collections/purple-heart. The Foundation would receive $100 from the sale of each jacket.

47.     US Wings has offered discounts to members of the Order, and the Foundation has sought the Order's cooperation in publicizing these products to Order members. The Order has consistently failed to publicize these products and discounts and, because of the Order's intransigence, the Foundation has realized no benefit from this partnership.

48.     American Cotton is a linen manufacturer committed to supporting United States veterans. *Helping American Veterans*, AMERICAN COTTON, https://americancotton.com/pages/helping-american-veterans. It has a website link that ties directly to the Foundation's website. *The Purple Heart Foundation*, AMERICAN COTTON, https://americancotton.com/pages/the-purple-heart-foundation.

49.     In the Summer of 2018, American Cotton co-founder Jeffrey Tauber contacted Foundation CEO Steve Ruckman to donate sheets to veterans in the New Jersey area. By email sent June 1, 2018, Ruckman introduced Tauber to New Jersey resident and then-National Commander of the Order Neil Van Ess. In spite of repeated attempts to contact Van Ess over the subsequent weeks, neither Ruckman nor Tauber was able to procure the Order's assistance in facilitating the donation. As a result of the failure of this initial partnership effort, the Foundation has been unable to forge an ongoing relationship with American Cotton, and has been deprived of its attendant donations and publicity. Consequently, the Foundation has lost many thousands of dollars in potential donations.

50.     Similar to the Order's refusal to lend its support to the Foundation's corporate partnerships, the Order has also refused to cooperate with the Foundation's other fundraising efforts. As one example, the Foundation regularly participates in the United Way's Combined

Federal Campaign. *About the Combined Federal Campaign*, MILITARY ORDER OF THE PURPLE HEART SERVICE FOUNDATION, https://purpleheartfoundation.org/cfc. The Combined Federal Campaign invites its participating organizations to informational events throughout the country to educate federal employees regarding the organizations to which they are invited to donate. While the Foundation's office staff is able to attend many events near its headquarters— including more than sixty in the past three years—it requires the resources of the Order's nationwide member network to participate in events farther afield. In spite of repeated requests made informally and at meetings of the Order's board of directors, and dozens of opportunities, the Order has participated in only a few events.

51.    In 2018, the Foundation applied to the Texas Veterans Commission for a $600,000 grant to offset the expenses of services for veterans performed by certain chapters of the Order in Texas. Felix Garcia III, National Senior Vice Commander of the Order, personally knew individuals on the commission who would be making the decision on the awarding of the grant. Steve Ruckman, Chief Executive Officer of the Foundation, contacted Garcia by telephone and text message several times, asking him whether the Foundation could use his biography as part of the grant application. Despite his dual position as a member of the Foundation's Board, Garcia never responded to Ruckman's request and thus the Foundation could not use his biography as part of the application. The commission did not award the grant to the Foundation.

*National Service Officers Program*

52.    In addition to the Order's refusal to undertake even the most basic collaboration with respect to most of the Foundation's corporate partnership programs, the Order has also sought to interfere with the Foundation's fundraising efforts relating to the National Service Officers Program.

16

53.     The National Service Officers Program is a program run by the Order and its chapters that has been largely funded by the Foundation and assists veterans, their spouses, surviving dependents, and orphans in a variety of ways, principally assisting veterans in accessing a number of benefit programs to which they may be entitled. *National Service Officers Program*, MILITARY ORDER OF THE PURPLE HEART SERVICE FOUNDATION, https://purpleheartfoundation.org/services/national-service-officers-program; *The Service Program*, MILITARY ORDER OF THE PURPLE HEART, https://www.purpleheart.org/our-services/the-service-program.

54.     In April 2018, without any advance notice or warning to the Foundation, the Order abruptly announced that the National Service Officers Program would be shuttered, issuing a press release falsely and maliciously blaming the alleged "failure of the Purple Heart Foundation, the fundraising arm of the Organization, to be able to raise sufficient funds to sustain operation of the Service Program and a number of other programs of the Order." *Military Order of the Purple Heart Announces Suspension of its National Service Program*, GLOBENEWSWIRE (Apr. 21, 2018), https://globenewswire.com/news-release/2018/04/21/1483656/0/en/Military-Order-of-the-Purple-Heart-Announces-Suspension-of-its-National-Service-Program.html (Order press release). This press release led to an article in the *Military Times* newspaper excoriating the Foundation for allegedly failing to fund the Order. Geoff Ziezulewicz, *Military Order of the Purple Heart to End VA Assistance Program*, MILITARY TIMES (Apr. 26, 2018), https://www.militarytimes.com/news/your-military/2018/04/26/military-order-of-the-purple-heart-to-end-va-assistance-program; *see also* Geoff Ziezulewicz, *Why the Future of the Military Order of the Purple Heart Is at Risk*,

MILITARY TIMES (July 3, 2018), https://www.militarytimes.com/news/your-military/2018/07/03/why-the-future-of-the-purple-heart-foundation-is-at-risk.

55.     In fact, the Foundation committed to funding the Order at a level representing a large percentage of the previous year's funding. The Order then released another press release. *Military Order of the Purple Heart Announces Resumption of its National Service Program*, GLOBENEWSWIRE (May 22, 2018), https://globenewswire.com/news-release/2018/05/22/1510449/0/en/CORRECTION-Military-Order-of-the-Purple-Heart-Announces-Resumption-of-its-National-Service-Program.html. While the second press release corrected some of the false accusations made in the first press release and cited "increases in donations and revenues" and "new efficiencies in the Foundation's business practices," the harm to the Foundation's reputation and the Foundation Marks done by the initial press release had already been felt. That harm continues up to the present day.

56.     The Order's April 2018 press release coincided with one of the Foundation's regular direct mail campaigns. Revenues from that campaign were lower than expected based on historical norms. Similarly, mailings to solicit donations of clothes or used cars for the Foundation's acquisition programs have suffered a reduced response since the Order's false press release.

*The Order's Competing Fundraising Efforts*

57.     In addition to interfering with the Foundation's fundraising efforts, the Order has also embarked on fundraising efforts of its own even though, to the Foundation's knowledge, the Order is not registered to solicit funds in states where such registration is required. The Order's fundraising efforts directly conflict and compete with those of the Foundation, and cause confusion amongst the donating public as to the destination of their donations. The Order's

independent fundraising efforts, which have not been authorized by or coordinated with the Foundation, have directly harmed the Foundation's ability to raise funds.

58.    Through the end of 2017, the home page of the Order's website featured a listing of "The Purple Heart Family," including the Foundation. *See Home Page*, MILITARY ORDER OF THE PURPLE HEART (Dec. 21, 2017), http://web.archive.org/web/20171221170115/http://www.purpleheart.org:80. Immediately beneath the listing for the Foundation was a button with the text "Make a Donation," linking to the Foundation's page for accepting donations, at the URL <http://purpleheartfoundation.org/donation-direct-support>. *Id.*

59.    Around the fourth quarter of 2018, the Order inaugurated a competing online fundraising program with a redesigned home page. *Home Page*, MILITARY ORDER OF THE PURPLE HEART (Nov. 14, 2018), http://web.archive.org/web/20181114124105/https://www.purpleheart.org. This remains the current version of the Order's home page. *Home Page*, MILITARY ORDER OF THE PURPLE HEART, https://www.purpleheart.org. The new design features a prominent "DONATE" button in the menu bar at the top of the page. This button, however, does not link to the Foundation; rather, it links to a page the Order maintains on its own site to compete with the Foundation for donations at the URL <www.purpleheart.org/donate>. *Id.*

60.    On the Order's donation page, the Order twice uses "The Purple Heart"—the Foundation Mark—to describe the recipient of donations made through that page, first describing Douglas Greenlaw as "National Commander" of "The Purple Heart," and then asking page visitors to "Donate to the Purple Heart." The Order has used the mark PURPLE HEART without MOPHSF's approval or consent.

19

61.     More broadly, the Order has substantially increased its unauthorized and competitive fundraising activities over the past several months. In addition to the changes it has made to cease directing donors to the Foundation via the Order's website, the Order—for the first time—ran competing social media and email campaigns for Giving Tuesday, the post-Thanksgiving day of international charitable giving. *See, e.g., Purple Heart Needs Your Help*, MILITARY ORDER OF THE PURPLE HEART (Nov. 20, 2018), https://www.instagram.com/moph_hq/p/BqaKMZVHFiC. The Order also repeatedly sent direct solicitations to its membership for an end-of-the-year fundraising push, in direct competition with the Foundation's fundraising efforts. All of these efforts featured the PURPLE HEART service mark.

62.     Following the Order's competing social media campaign, previous recurring donors to the Foundation cancelled their donations to the Foundation and switched their donations to the Order. As a result of the Order's efforts to compete against the Foundation, to subvert the Foundation's activities, and to take actions to harm the Foundation, the Foundation has been unable to raise the same level of funds as it would have absent the Order's actions.

63.     The Order's actions have caused and continue to cause a likelihood of confusion and irreparable harm to the Foundation, including harm to the Foundation's and the Foundation Marks' reputation and goodwill.

**The Foundation's Notice to the Order**

64.     By the end of 2018, following protracted discussions and negotiations between the Order and the Foundation to try to resolve the various disagreements that had arisen between them, the Foundation lacked all confidence that the parties would be able to resolve their disagreements.

65.     Therefore, in accord with the termination procedures outlined in the 2016 Settlement Agreement, on January 25, 2019, the Foundation served the Order with a notice to cure stating that the Order's numerous actions to undermine the Foundation's fundraising and other activities, continuing to the present, constituted breaches of the 2016 Settlement Agreement and the 2009 Memorandum of Understanding. Because the Order's breaches under the 2016 Settlement Agreement were, by their nature, incurable, in that the activities and adverse actions undertaken by the Order could not be undone, and because such breaches did not require a cure period under that Agreement, the Foundation advised the Order that the 2016 Settlement Agreement (in addition to the 2009 Memorandum of Understanding) was "null and void and of no further force or effect" upon service of the Notice.

66.     Similarly, on January 25, 2019, MOPHSF Holdings LLC served the Order with a notice of default and termination with respect to the Order License Agreement.

## COUNT I
### Breach of Contract—2009 MOU

67.     The allegations of paragraphs 1 through 66 are hereby incorporated by reference.

68.     In the 2009 MOU between the Order and the Foundation, the Order agreed to "advise the Foundation of all fundraising efforts being undertaken by its Departments, Chapters and Affiliates so that any local fundraising effort does not conflict with or interfere with the Foundation's fundraising activities or those of its fundraisers," as well as to refrain from activities that conflict or interfere with the Foundation's fundraising activities or those of its fundraisers. The Order also agreed to coordinate "[a]ll public relation initiatives including press releases . . . to the extent possible."

69.     In spite of these obligations, and in spite of multiple fundraising efforts being undertaken by the Order's Departments, Chapters, and Affiliates, the Order has not advised the

Foundation of any of these efforts, including its efforts in 2018 and, upon information and belief, in 2019. Neither has the Order coordinated or attempted to coordinate any of its public relation initiatives with the Foundation. Indeed, the Order has attacked the Foundation in the Order's public relation initiatives.

70.     Because of the Order's failure to advise the Foundation of the fundraising efforts being undertaken by the Order's Departments, Chapters, and Affiliates, those efforts have conflicted with and interfered with the Foundation's fundraising efforts by targeting the same group of potential donors via direct mailing, calling centers, and/or online. Moreover, because of the Order's failure to coordinate its public relation initiatives with the Foundation as required, the Foundation's publicity and fundraising efforts have been less effective than they otherwise would have been. The Order has also failed to provide monthly financial reports to the Foundation, as required by the 2009 MOU, for the past several months.

71.     The Foundation has performed all of its obligations under the 2009 MOU.

72.     The Foundation has been harmed by the Order's material breaches of the 2009 MOU.

## COUNT II
### Breach of Contract—2016 Settlement Agreement

73.     The allegations of paragraphs 1 through 72 are hereby incorporated by reference.

74.     In the 2016 Settlement Agreement between the Order and the Foundation, the Order agreed not to take any "adverse action against the Service Foundation during its August 2016 National Convention or thereafter."

75.     In spite of this obligation, the Order has repeatedly taken adverse actions against the Foundation by, among other things, interfering with its corporate partnerships, publically

disparaging the Foundation in the Order's April 2018 press release and otherwise, and conducting competing fundraising campaigns.

76.     Because of the Order's adverse actions against the Foundation, the Foundation's publicity and fundraising efforts have generated less revenue and been less effective than they otherwise would have been.

77.     The Foundation has performed all of its obligations under the 2016 Settlement Agreement.

78.     The Foundation has been harmed by the Order's material breaches.

### COUNT III
**Breach of Contract—2017 Trademark and Service Mark License Agreement**

79.     The allegations of paragraphs 1 through 78 are hereby incorporated by reference.

80.     In the Order License Agreement, the Order agreed to use the Foundation Marks "only in connection with charitable fundraising for specific projects that are approved by MOPHSF Holdings, LLC and are consistent with [the Order's] mission statement." The Order further agreed that its "sales and marketing policies" in using the Marks would not "be inconsistent with the policies and marketing strategies" set by MOPHSF Holdings.

81.     In spite of this obligation, the Order has used the PURPLE HEART Mark in connection with charitable fundraising projects not approved by MOPHSF Holdings, LLC.

82.     MOPHSF Holdings has performed all of its obligations under the License Agreement.

83.     MOPHSF Holdings has been deprived of the control of its Marks and has otherwise been harmed by the Order's material breaches of the Order License Agreement.

## COUNT IV
### Declaratory Relief

84.     The allegations of paragraphs 1 through 83 are hereby incorporated by reference.

85.     An actual controversy exists between the Foundation and the Order concerning the Foundation's obligations under the 2009 MOU and 2016 Settlement Agreement. The Foundation desires a judicial determination of its obligations under those agreements, and a declaration as to the same.

86.     The Order has breached certain of its material obligations under the 2009 MOU and the 2016 Settlement Agreement. Among other actions and without limitation, the Order has not advised the Foundation of its fundraising efforts and undertaken conflicting and competing efforts; interfered with the Foundation's corporate partnerships; and not coordinated its public relations initiatives with the Foundation and indeed publically disparaged the Foundation.

87.     The Foundation has performed all of its obligations under the 2009 MOU and the 2016 Settlement Agreement.

88.     Because of the Order's prior material breach, termination of the 2009 MOU and 2016 Settlement Agreement is proper and justified. In accordance with the specific termination provisions of the 2016 Settlement Agreement, that Agreement is "null and void and of no further force or effect." Accordingly, the Foundation seeks a declaration from the Court that it is released from all future obligations under the 2009 MOU and the 2016 Settlement Agreement and has no further obligation to perform under those agreements.

## COUNT IV
### Service Mark Infringement

89.     The allegations of paragraphs 1 through 88 are hereby incorporated by reference.

90.     The Order has been and currently is engaged in acts constituting infringement of the PURPLE HEART Mark within the meaning of Section 32(1) of the Trademark Act of 1946,

15 U.S.C. § 1114(1), through the Order's use, on its website and in other media, of PURPLE HEART in commerce in the sale, offering for sale, or advertisement of services in a manner that creates a likelihood of confusion, mistake, or deception.

91.     While the Order is licensed to use the Marks, the Order has used the Marks beyond the terms of its license by failing to gain MOPHSF Holdings's approval for specific fundraising projects using the Marks. Among those projects is the Order's use of the PURPLE HEART Mark on its website. This use is not permitted under the Order's license.

92.     The Order's unauthorized use of the PURPLE HEART Mark is likely to confuse or deceive the public into believing, contrary to fact, that the website fundraising activity of the Order is licensed, sponsored, authorized, or otherwise approved by MOPHSF Holdings. These infringing acts have been done without the consent of MOPHSF Holdings. Such unauthorized use of the PURPLE HEART Mark infringes MOPHSF Holdings' exclusive rights in its service mark under Section 32 of the Trademark Act of 1946, 15 U.S.C. § 1114.

93.     The Order's actions were and are being done knowingly and intentionally to cause confusion, or to cause mistake, or to deceive.

94.     As a direct and proximate result of the Order's actions, the Foundation has suffered and is continuing to suffer irreparable injury. Unless enjoined by this Court, the Order's wrongful acts will continue to injure the Foundation and the public.

### COUNT V
### Unfair Competition

95.     The allegations of paragraphs 1 through 94 are hereby incorporated by reference.

96.     The Order, by using the PURPLE HEART Mark without authorization, has caused and is causing a likelihood of confusion, deception, or mistake as to the affiliation, connection, or association of fundraising efforts conducted by the Order with the Foundation, or

as to the origin, sponsorship, or approval of fundraising efforts of the two entities, in violation of Section 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1125(a).

97.     The Order's actions were and are being done knowingly and intentionally to cause confusion, or to cause mistake, or to deceive.

98.     The Order's actions constitute unfair competition and false designation of origin, in violation of Section 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1125(a).

99.     As a direct and proximate result of the Order's actions, MOPHSF Holdings and the Foundation have suffered and are continuing to suffer irreparable injury. Unless enjoined by this Court, the Order's wrongful acts will continue to injure MOPHSF Holdings, the Foundation, and the public.

**PRAYER FOR RELIEF**

WHEREFORE, the Foundation prays that this Court:

A.      Enter a judgment declaring that the Order has materially breached the 2009 Memorandum of Understanding and 2016 Settlement Agreement and that those Agreements are null and void and/or terminated and that the Foundation has no further obligation to perform thereunder;

B.      Enter a judgment declaring that the Order has materially breached its Order License Agreement with MOPHSF Holdings and that the License Agreement has been properly terminated and the Order has no further rights under that License;

C.      Enter an order permanently enjoining the Order from using in connection with charitable fundraising PURPLE HEART or any words, marks, trade names, corporate names, or domain names that are confusingly similar to PURPLE HEART;

D.      Enter an order permanently enjoining the Order from engaging in unfair competition with MOPHSF Holdings and the Foundation;

E.      Enter an award of all costs and attorney's fees in favor of MOPHSF Holdings and against the Order pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117; and

F.      Award the Foundation and MOPHSF Holdings such other relief as this Court may deem just and proper.

Dated:  January 25, 2019                    /s/ Eric L. Yaffe
                                            Eric L. Yaffe (DCB # 439750)
                                            Michael L. Sturm (DCB # 422338)
                                            Samuel A. Butler (DCB # 1601091)
                                            GRAY, PLANT, MOOTY, MOOTY
                                             & BENNETT, P.A.
                                            The Watergate – Suite 700
                                            600 New Hampshire Avenue, NW
                                            Washington, DC 20037
                                            Tel.:  (202) 295-2200
                                            Fax:  (202) 295-2250
                                            eric.yaffe@gpmlaw.com
                                            michael.sturm@gpmlaw.com
                                            samuel.butler@gpmlaw.com

                                            *Attorneys for Plaintiffs Military Order of the Purple Heart Service Foundation, Inc. and MOPHSF Holdings, LLC*